807 S.E.2d 723

**Kathleen LOLLIS and Linda Campbell, Appellants/Respondents,**

**v.**

**Lisa DUTTON, Dennis Dutton, and Kelsey
Dutton, Respondents/Appellants.**

**Appellate Case No. 2015-001861
Opinion No. 5522**

Court of Appeals of South Carolina.

Submitted September 7, 2017
Filed November 1, 2017

470

Matthew P. Turner, of Laurens, for Appellants/Respondents.

John R. Ferguson, of Cox Ferguson & Wham, LLC, of Laurens, for Respondents/Appellants.

GEATHERS, J.:

Appellants/Respondents, Kathleen Lollis and Linda Campbell, and Respondents/Appellants, Lisa Dutton, Dennis Dutton, and Kelsey Dutton (collectively, the Duttons), have filed cross-appeals from the circuit court's order in this declaratory judgment action. Appellants/Respondents argue the circuit court erred by concluding (1) Kathleen Lollis (Mother), through her late son, Frank Lollis (Frank), entered into binding contracts with Lisa Dutton and Dennis Dutton to sell two tracts of land and (2) Lisa Dutton (Lisa) overpaid Appellants/Respondents by $850.96. The Duttons argue the circuit court erred by declining to award them attorney's fees and costs. We affirm the circuit court's conclusions that the disputed contracts were binding and Lisa overpaid Appellants/Respondents.[1] Further, we vacate the denial of attorney's fees and costs and remand this issue to the circuit court.

## FACTS/PROCEDURAL HISTORY

On October 20, 2011, Lisa entered into a contract of sale for a mobile home and the tract of land on which it was located, Tract A2 on Cemetery Road, i.e., 1032 Cemetery Road, in Ware Shoals.[2] The contract named Mother as the seller and Lisa as the purchaser and required Lisa to pay a purchase price of $58,650, plus 5 percent annual interest, in monthly installments of $400. The contract also required Lisa to pay county property taxes and Mother to transfer Tract A2 to Lisa when Lisa paid "the purchase price plus all accrued

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. Lisa had already moved into the mobile home in July 2011 and had begun making payments on the property on August 3, 2011.

interest" in full. However, the contract provided, "If [Lisa] does not make payments within thirty (30) days of the due date, [Mother] shall have the right to immediately retake possession of the subject property and all payments made by [Lisa] under [the contract of sale] shall be forfeited." The contract was amended on January 4, 2012, to correct the identifying information for the mobile home.

Frank, who lived with and took care of Mother, signed Mother's name to the contract and its amendment.[3] John Scurry, Jr., an attorney who handled Frank's real estate transactions, prepared the contract of sale for Tract A2 and signed his name as a witness. Attorney Scurry testified he saw Frank sign Mother's name and he thought he recalled Frank showing him a power of attorney naming Frank as Mother's attorney-in-fact. Lisa testified Frank had told her previously that he had a power of attorney for Mother. At trial, Mother denied that Frank had a power of attorney for her.

Lisa had known Frank for nineteen years and did a lot of real estate business with him and his family. She testified all of the locations where she had lived for the previous ten years were related to the Lollis family and every time she purchased property that was titled in Mother's name, Lisa dealt with Frank and Attorney Scurry. She typically signed documents related to their real estate transactions at Attorney Scurry's office or at his house, and she "never had an issue until" she tried to obtain a deed for Tract A2. Lisa also testified that when she arrived to sign the contract of sale for Tract A2, the contract already had a signature for Mother.

Attorney Scurry testified that Frank did a lot of his business in cash and always carried a lot of cash. Frank typically bought property in other individuals' names and signed their names to documents, including not only Mother but also Roger Davenport, a former employee. In his January 6, 2014 affidavit, Attorney Scurry stated,

---

**3.** Frank had previously commissioned a survey for a larger parcel on Cemetery Road for the purpose of dividing it into Tract A and Tract A2. The survey was completed on October 18, 2011 and recorded on November 21, 2011. The survey refers to "Tracts A1 and A2," but all other references in the record are to Tract A and Tract A2.

Frank did a lot of real estate transactions, but he explained that because of his 'checkered past[,]' he generally put the property in other [individuals'] names. Most of his property [was] put in [Mother's name]. It is my opinion that [Mother] knew that Frank titled property in her name.

Barry Adams, who had worked for Frank, testified that Frank "was kind of picky about signing anything. He wouldn't sign anything unless he had a lawyer notary public [sic] present and [made] sure the right person was there to sign." But Adams admitted Frank "didn't put anything in his name." Adams also testified Frank told him he was planning to let Lisa keep the mobile home but also tell her to move it off of Tract A2:

[H]e ... told me ... that the paperwork was all screwed up.... [W]e couldn't find the data plate on the mobile home that [Lisa] lives in and he had other papers with the serial number. The title had been lost. He said that he wanted to give [Lisa] that mobile home but he wanted her to move it somewhere else and get it off of [Mother's] property because he was tired of fooling with it. That it was just a hassle and he wanted it gone and wanted them gone.

When asked why Frank included the land in the contract of sale, Adams stated, "I don't know anything about that. He just said that she was trying to talk him into letting her get that land and it belonged to [Mother]. And he couldn't do that or something like that, something to that effect."

According to Frank's sister, Appellant/Respondent Linda Campbell (Sister), Frank was slowly dying from cancer as early as 2011. As Frank became increasingly ill, Attorney Scurry prepared a written power of attorney for Mother naming Sister as her attorney-in-fact. Sister's power of attorney for Mother was executed on November 23, 2011. Attorney Scurry explained, "[I]t was sort of agreed that [Sister] was going to kind of take over."

In December 2012, Frank orally agreed to sell Tract A on Cemetery Road to Lisa's husband, Respondent/Appellant Dennis Dutton (Dennis),[4] rather than to another individual who was interested in the property, if Dennis could "pay [it] off

4. Lisa and Dennis were separated at the time.

quickly." Therefore, on December 17, 2012, Dennis entered into a written contract to purchase Tract A and the mobile home on this tract. The contract named Mother and Frank as the sellers and Dennis as the purchaser. The contract required Dennis to pay county property taxes and a purchase price of $27,700 in monthly installments of $300, but it did not require the payment of interest on the purchase price. The contract also required Mother and Frank to transfer Tract A to Dennis when the purchase price was paid in full. However, the contract provided, "If [Dennis] does not make payments within thirty days [ ] of the due date[, Mother and Frank] have the right to immediately retake possession of the subject properties."

Frank and Lisa drafted this contract at the county library. Lisa explained that Frank asked her to draft the contract using previous contracts drafted by Attorney Scurry as templates. Lisa testified they then "went back to the house," and Frank and Dennis signed the contract there. Lisa further testified she and her daughter, Respondent/Appellant Kelsey Dutton (Kelsey), witnessed Frank and Dennis signing the contract. According to Lisa, Frank then took the contract to Mother to obtain her signature. Heather Fields, the Town Clerk for the Town of Ware Shoals, testified Lisa and Frank brought the contract to Fields that same day for her to notarize. Fields stated that Frank and Lisa signed the contract in Fields' presence before she notarized it.

As Frank was approaching death, Lisa called Attorney Scurry to ask "what was going to happen about her payments and all" and "if Frank had contacted [him] about a deed." When Attorney Scurry told Lisa that Frank had not contacted him, Lisa informed Attorney Scurry she was going to visit Frank at the hospice house in Greenwood. According to Sister, Frank went into hospice care the last week of his life, and he died on April 28, 2013. Sister testified she and Mother "couldn't see any peace from [Frank] dying on his deathbed for [Lisa] calling him on the phone taking [chemotherapy]."

A few days after Frank died, Lisa approached Sister about making a payment on Tract A2 and the mobile home. Sister testified she did not know what Lisa was talking about at the time and she asked Lisa to give her time as she had "just

buried [Frank]." [5] Sister also testified she later received a letter from Lisa's attorney indicating Lisa had completed paying the amount she owed for Tract A2 and the mobile home and asking for a deed to the property and the release of a lien on the mobile home.[6]

On September 11, 2013, Mother and Sister filed an amended complaint against the Duttons seeking (1) temporary and permanent injunctions prohibiting the Duttons from occupying or using Tract A and Tract A2; (2) a judgment declaring Mother to be the sole owner of Tract A and Tract A2 and determining the ownership of the mobile homes, including a declaration that Sister is the sole owner of the mobile home on Tract A2; (3) an order quieting title to Tract A and Tract A2; (4) damages for trespass, fraud/misrepresentation, civil conspiracy, slander of title, conversion, and intentional infliction of emotional distress; and (4) attorney's fees and costs.[7] The Duttons answered and counterclaimed seeking (1) specific performance of the contracts of sale for Tracts A and A2; (2) damages for abuse of process, slander of title, civil conspiracy, fraud/negligent misrepresentation, and violation of the Statute of Elizabeth; and (3) attorney's fees and costs.

After a bench trial, the circuit court issued an order concluding Frank was "acting as the authorized agent for [Mother and Sister] in his dealings with [the Duttons]." The circuit court addressed Mother's and Sister's declaratory judgment cause of action by finding the Duttons had valid and enforceable rights under the contracts of sale. The circuit court dismissed Mother's and Sister's other causes of action. Further, the circuit court granted the Duttons' request for specific performance of the contracts and dismissed their other causes of action. The circuit court also ruled that attorney's fees were "denied to [Mother, Sister and the Duttons]." Mother and Sister filed a "Motion to Reconsider, Alter, or Amend Pursu-

5. Lisa denied that Sister asked her for time.

6. The lien was in Sister's name even though Sister testified she had no idea how she obtained it. Lisa testified she did not sign the back of the Certificate of Title granting a lien to Sister but rather Lisa's name was forged.

7. The original complaint is not in the record, and the parties have not indicated when the original complaint was filed and served.

ant to Rule 59(e)," and the Duttons filed a "Motion to Alter or Amend and Motion for Attorney Fees" with an accompanying "Attorney Fee Affidavit" and "Affidavit of Costs." The circuit court summarily denied all post-trial motions. This appeal followed.

## ISSUES ON APPEAL

1. Was Frank acting as an agent for Mother when he entered into the contracts with Lisa and Dennis?
2. Did the circuit court err by concluding Lisa overpaid Mother by $850.96?
3. Did the circuit court err by summarily denying the Duttons' request for attorney's fees and costs?

## STANDARD OF REVIEW

"This [c]ourt reviews all questions of law de novo." *Fesmire v. Digh*, 385 S.C. 296, 302, 683 S.E.2d 803, 807 (Ct. App. 2009); *see also Clardy v. Bodolosky*, 383 S.C. 418, 425, 679 S.E.2d 527, 530 (Ct. App. 2009) ("Questions of law may be decided with no particular deference to the trial court." (quoting *S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 654, 667 S.E.2d 7, 12 (Ct. App. 2008))). "Review of the [circuit] court's factual findings, however, depends on . . . whether the underlying action is an action at law or an action in equity." *Fesmire*, 385 S.C. at 302, 683 S.E.2d at 807 (citing *Townes Assocs. Ltd. v. City of Greenville*, 266 S.C. 81, 85–86, 221 S.E.2d 773, 775–76 (1976)). Further, "[w]hen a suit involves both legal and equitable issues, each cause of action retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Holly Woods Ass'n of Residence Owners v. Hiller*, 392 S.C. 172, 180, 708 S.E.2d 787, 792 (Ct. App. 2011).

In an action at law, the circuit court's factual findings "will not be disturbed upon appeal unless found to be without evidence [that] reasonably supports the [circuit court's] findings." *Townes*, 266 S.C. at 86, 221 S.E.2d at 775. "On appeal from an action in equity, [the appellate court] may find facts in accordance with its view of the preponderance of the evidence." *Walker v. Brooks*, 414 S.C. 343, 347, 778 S.E.2d

477, 479 (2015). "However, this broad scope of review does not require this court to disregard the findings at trial or ignore the fact that the [circuit court] was in a better position to assess the credibility of the witnesses." *Laughon v. O'Braitis*, 360 S.C. 520, 524–25, 602 S.E.2d 108, 110 (Ct. App. 2004). Further, "this broad scope does not relieve the appellant of [the] burden to show that the trial court erred in its findings." *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d 107, 109 (2012); *accord Pinckney v. Warren*, 344 S.C. 382, 387–88, 544 S.E.2d 620, 623 (2001).

"To determine whether an action is legal or equitable, this [c]ourt must look to the action's main purpose as reflected by the nature of the pleadings, evidence, and character of the relief sought." *Fesmire*, 385 S.C. at 303, 683 S.E.2d at 807; *see also Alford v. Martin*, 176 S.C. 207, 212, 180 S.E. 13, 15 (1935) ("The character of an action is determined by the complaint in its main purpose and broad outlines and not . . . by allegations that are merely incidental."). Here, we examine only those causes of action that the circuit court addressed, i.e., the Amended Complaint's declaratory judgment cause of action and the Duttons' counterclaim for breach of contract.

"Declaratory judgments are neither legal nor equitable." *Bundy v. Shirley*, 412 S.C. 292, 301, 772 S.E.2d 163, 168 (2015). "The standard of review for a declaratory judgment action is, therefore, determined by the nature of the underlying issue." *Id.* In their declaratory judgment cause of action, Mother and Sister sought a judgment declaring the Duttons to have no legal or equitable interest in Tract A or Tract A2; Mother sought a judgment declaring her to be the sole owner of Tracts A and A2; and Sister sought a judgment declaring her to be the sole owner of the mobile home on Tract A2. Hence, the issue underlying Mother's and Sister's declaratory judgment cause of action is in the nature of a quiet title claim.

"Typically, an action to remove a cloud on and quiet title to land is one in equity." *Estate of Tenney v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 100, 105, 712 S.E.2d 395, 397 (2011); *see also Holly Woods*, 392 S.C. at 180–81, 708 S.E.2d at 792 ("[A]n action to quiet title to property is an action in equity." (quoting *Jones v. Leagan*, 384 S.C. 1, 10, 681 S.E.2d 6, 11 (Ct. App. 2009))). "However, 'when the defen-

dant's answer raises an issue of paramount title to land, such as would, if established, defeat the plaintiff's action, the issue of title is legal.' " *Estate of Tenney*, 393 S.C. at 105, 712 S.E.2d at 397 (quoting *Dargan v. Tankersley*, 380 S.C. 480, 483, 671 S.E.2d 73, 74 (2008)). Here, the Duttons' answer did not precisely assert a paramount title to Tracts A and A2. In fact, they conceded Mother held legal title to these tracts. Rather, they asserted they held equitable title to the tracts and sought specific performance as a remedy for Mother's alleged breach of the contracts to sell the tracts.

Further, our appellate courts have traditionally viewed the main purpose of a cause of action seeking specific performance as the pursuit of equitable relief and thus have found such a claim to be equitable in nature. *See Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290–91 (2000) (applying the equitable standard of review to the findings of fact in a specific performance action); *Lowcountry Open Land Trust v. Charleston S. Univ.*, 376 S.C. 399, 406, 656 S.E.2d 775, 779 (Ct. App. 2008) (holding that an action for specific performance lies in equity).[8]

Based on the foregoing, we view the two causes of action addressed by the circuit court in the instant case as equitable in nature. Therefore, this court may review the circuit court's factual findings in accordance with its own view of the preponderance of the evidence. *Walker*, 414 S.C. at 347, 778 S.E.2d at 479 ("On appeal from an action in equity, [the appellate court] may find facts in accordance with its view of the preponderance of the evidence."). Nonetheless, we defer to the circuit

---

8. In *Fesmire*, this court noted the supreme court's application of the *legal* standard of review to the factual findings in a specific performance action in *McGill v. Moore*, 381 S.C. 179, 672 S.E.2d 571 (2009). 385 S.C. at 304, 683 S.E.2d at 807–08. We distinguished *Fesmire* from *McGill* by explaining that the very existence of a contract with the specific terms asserted by the Fesmires was disputed, whereas in *McGill*, the existence of the contracts was undisputed and the court was required to interpret the contracts' written provisions before determining the suitability of specific performance as a remedy. *Id.* at 304, 683 S.E.2d at 807. The *McGill* court concluded the purpose of the action before it was to construe a contract and such an action was an action at law. *McGill*, 381 S.C. at 185, 672 S.E.2d at 574. Here, as in *Fesmire*, very existence of the contracts was disputed because Mother alleged that her signatures were forged. Therefore, we find the instant action to be distinguishable from *McGill*.

court's determinations of witness credibility. *See Laughon*, 360 S.C. at 524–25, 602 S.E.2d at 111 ("However, this broad scope of review does not require this court to disregard the findings at trial or ignore the fact that the [circuit court] was in a better position to assess the credibility of the witnesses."); *see also Ballard*, 399 S.C. at 593, 733 S.E.2d at 109 ("[T]his broad scope does not relieve the appellant of his burden to show that the trial court erred in its findings.").

## LAW/ANALYSIS

### I. Agency

Mother and Sister argue the circuit court erred by concluding Mother entered into contracts with Dennis and Lisa for the sale of Tracts A and A2 and ordering specific performance of the contracts because Frank was not an agent for Mother. We disagree.

"Agency is a question of fact." *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 226, 317 S.E.2d 748, 752 (Ct. App. 1984). "[T]he relationship of agency need not depend upon express appointment and acceptance thereof. Rather, an agency relationship may be, and frequently is, implied or inferred from the words and conduct of the parties and the circumstances of the particular case." *Nationwide Mut. Ins. Co. v. Prioleau*, 359 S.C. 238, 242, 597 S.E.2d 165, 168 (Ct. App. 2004).

The law creates the relationship of principal and agent if the parties, in the conduct of their affairs, actually place themselves in such position as requires the relationship to be inferred by the courts, and if, from the facts and circumstances of the particular case, it appears that there was at least an implied intention to create it, the relation may be held to exist, notwithstanding a denial by the alleged principal, and whether or not the parties understood it to be an agency.

*Id.* (quoting *Crystal Ice Co. of Columbia v. First Colonial Corp.*, 273 S.C. 306, 309, 257 S.E.2d 496, 497 (1979)).

In other words, agency "may be proved circumstantially by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged princi-

pal." *Town of Kingstree v. Chapman*, 405 S.C. 282, 315, 747 S.E.2d 494, 511 (Ct. App. 2013) (quoting *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 434, 540 S.E.2d 113, 118 (Ct. App. 2000)); *see also* 18 Am. Jur. 2d *Conversion* § 111 (2017) ("When an owner expressly or impliedly assents to or ratifies a disposition of certain property, there can be no recovery for conversion as there was no unauthorized conduct regarding property of the owner.").

Further, "the doctrine of apparent authority provides that the principal is bound by the acts of his agent when he *has placed the agent in such a position that* persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption." *Spence v. Spence*, 368 S.C. 106, 126, 628 S.E.2d 869, 879 (2006) (emphasis added).

> A principal may be held liable to a third person in a civil lawsuit for the fraud, deceit, concealment, misrepresentation, negligence, and other omissions of duty of his agent [that] occur in the scope of the agent's employment, even when the principal did not authorize, participate in, or know of such misconduct or even when the principal forbade or disapproved of the act in question. This rule "is founded upon public policy and convenience, for *in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents*. In every such case[,] the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency.... *Seeing that some one must be [the] loser by the deceit, it is more reasonable that he who employs and confides in the deceiver should be the loser than a stranger*."

*Id.* at 126–27, 628 S.E.2d at 879–80 (emphases added) (citation omitted) (quoting *West v. Serv. Life & Health Ins. Co.*, 220 S.C. 198, 202, 66 S.E.2d 816, 817 (1951)).

Here, Attorney Scurry testified Mother was "fully aware that Frank was buying and selling property in her name" and was "transacting business in her name." Attorney

Scurry also testified that Frank "bought and sold a lot of property in [Mother's] name." Further, Lisa testified Mother was present when Lisa made some of her payments to Frank, Mother never objected, and Mother even retrieved the receipt book for Frank on a few occasions. Dennis and his daughter, Kelsey Dutton, gave similar testimony, and Dennis stated he believed Frank was acting on Mother's behalf. Dennis testified he made one of his payments on Tract A to Frank at Mother's house and Mother was present but did not object. Likewise, Larry Colson, a friend of Kelsey, delivered one of the Duttons' payments, a $700 check, to Frank at the Lollises' home in December 2012. Colson told Frank that Dennis sent him to make a mobile home payment, and Mother was present at that time.

Moreover, there was some evidence that Frank had a power of attorney for Mother until she named Sister as her attorney-in-fact on November 23, 2011, and Sister's power of attorney post-dated the contract of sale for Tract A2. But even if Frank never had a written power of attorney, Lisa testified (1) Frank **told her** he had a power of attorney for Mother; (2) Lisa relied on Frank's representation; and (3) she would not have entered into the contract of sale for Tract A2 and made payments on the property had she known Mother was not going to acknowledge her payments. Likewise, Dennis testified (1) he believed Frank was acting on Mother's behalf; (2) he relied on the course of dealing that Frank had established with him in previous transactions for property titled in Mother's name; and (3) if he had known that Mother was not going to honor the contract of sale for Tract A, he would not have entered into the contract and made payments on the property.

In sum, Mother's knowledge that Frank was buying and selling property in her name and her tacit acceptance of this practice placed Frank "in such a position that" Lisa and Dennis were "led to believe" Frank had the authority to act on Mother's behalf "and they in turn [dealt] with [Frank] based on that assumption." *Spence*, 368 S.C. at 126, 628 S.E.2d at 879; *see also Chapman*, 405 S.C. 282, 315, 747 S.E.2d 494, 511 ("[A]gency may be proved circumstantially by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal." (quoting *R & G Constr., Inc.*, 343 S.C. at 434, 540 S.E.2d at 118)).

Based on the foregoing, the preponderance of the evidence shows an agency relationship between Mother and Frank as well as his apparent authority to sell Tracts A and A2 to Dennis and Lisa. Therefore, Frank's actions were binding on Mother.

## II. Overpayment

Mother and Sister maintain the circuit court erred by concluding Lisa overpaid the sum of $850.96 and by ordering Mother and Sister to refund that amount to the Duttons. Specifically, Mother and Sister assign error to the circuit court's finding that the Duttons were more credible than Mother and Sister. We disagree.

Initially, we note Mother and Sister cite no authority for their argument. Therefore, this court may deem this argument abandoned. *See Bryson v. Bryson*, 378 S.C. 502, 510, 662 S.E.2d 611, 615 (Ct. App. 2008) ("An issue is deemed abandoned and will not be considered on appeal if the argument is raised in a brief but not supported by authority."). In any event, we find no error in the circuit court's finding that Lisa overpaid $850.96 to Mother and Sister.

Even when this court's scope of review is broadened in equity cases, "[t]he credibility of testimony is a matter for the finder of fact to judge." *S.C. Dep't of Soc. Servs. v. Forrester*, 282 S.C. 512, 516, 320 S.E.2d 39, 42 (Ct. App. 1984); *see Laughon*, 360 S.C. at 524–25, 602 S.E.2d at 111 (holding the preponderance-of-the-evidence standard of review "does not require this court to disregard the findings at trial or ignore the fact that the [circuit court] was in a better position to assess the credibility of the witnesses"). In a bench trial, the judge, as the finder of fact, may believe all, some, or none of the testimony, even when it is not contradicted. *Cf. Ross v. Paddy*, 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct. App. 2000) ("Even where the evidence is uncontradicted, the jury may believe all, some, or none of the testimony . . . ."). "Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to [circuit] court findings where matters of credibility are involved." *Forrester*, 282 S.C. at 516, 320 S.E.2d at 42.

■ Here, the circuit court relied on its assessment of the comparative credibility of the parties to find that the Duttons fulfilled their obligations under the disputed contracts and Lisa overpaid Mother and Sister by $850.96. We conclude Mother and Sister have failed to carry their burden of convincing this court that it should not defer to the circuit court's assessment. *See Ballard*, 399 S.C. at 593, 733 S.E.2d at 109 (stating the equitable standard of review "does not relieve the appellant of his burden to show that the trial court erred in its findings"). At trial, Lisa testified she made all of the payments required by the contract of sale for Tract A2, plus an extra $850.96, and she presented several canceled checks and cash receipts showing her monthly payments. Mother and Sister presented a handwriting expert in an attempt to cast doubt on the authenticity of this evidence. However, the circuit court had concerns with the specimen signatures Mother and Sister provided to their expert. Given our examination of the record, including Mother's repudiation of one of her own specimen signatures,[9] we share those concerns. *See Fletcher v. Med. Univ. of S.C.*, 390 S.C. 458, 463, 702 S.E.2d 372, 374 (Ct. App. 2010) ("The probative value of expert testimony stands or falls upon an evidentiary showing of the facts upon which the opinion is, or must logically be, predicated." (quoting *Ward v. Epting*, 290 S.C. 547, 563, 351 S.E.2d 867, 876 (Ct. App. 1986))).

Further, because Mother and Sister challenged Lisa's financial ability to pay for Tract A2, Lisa recited the sources of her income, which included proceeds from the sale of previously-owned real estate; a lump sum Social Security Disability payment; monthly disability payments; savings from monthly Social Security payments to her daughter Kelsey over the course of nine years; and gifts from relatives. Lisa also indicated Dennis received approximately $700 per month in Supplemental Security Income benefits and approximately $50,000 per year buying and selling items on craigslist. Dennis's testimony corroborated this, except to clarify that the $50,000 "wasn't all profit." Dennis also testified he paid all that was due under the contract of sale for Tract A, and he

---

9. One of Mother's specimen signatures was on her purported driver's license. At trial, Mother refused to verify the authenticity of this signature.

presented cash receipts showing his payments and a Certificate of Title to the mobile home showing Frank's release of his lien on the mobile home. The circuit court took judicial notice that the date on the last receipt and the date on the lien release were the same, February 3, 2013.

Several other witnesses corroborated Lisa's and Dennis's testimony concerning their payments as well as Frank's preference for doing business in cash. One of these witnesses, Heather Fields, a notary public, testified she saw Frank sign two cash receipts. The circuit court found Fields to be a credible, neutral witness, and our examination of the record confirms this assessment. In contrast, Sister refused to acknowledge receiving any payments on Tract A2 until confronted with her own endorsement of a $700 check written by Lisa.

Based on the foregoing, we find nothing untoward in the circuit court's assessment of witness credibility. Therefore, we conclude the circuit court appropriately relied on Lisa's credibility to find she overpaid the sum of $850.96 to Mother and Sister. In accordance with longstanding precedent, we accord great deference to the circuit court's assessment. *See Forrester*, 282 S.C. at 516, 320 S.E.2d at 42 ("Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to [circuit] court findings where matters of credibility are involved.").

### III. Attorney's Fees and Costs

The Duttons argue the circuit court erred in declining to award them attorney's fees and costs. On the other hand, Mother and Sister maintain the grounds for the Duttons' request for attorney's fees and costs are not preserved for review because the Duttons did not present these grounds to the circuit court.

As to one of these grounds, section 15-37-10 of the South Carolina Code (2005),[10] we agree with Mother and

---

10. Section 15-37-10 provides for the recovery of certain costs and disbursements in a civil action "to be inserted in the judgment against the losing party." However, the statute also provides that in equity cases, an award of costs and disbursements is within the court's discretion: "In cases in chancery[,] the same rule as to costs shall prevail unless otherwise ordered by the court."

Sister. The Duttons did not argue to the circuit court that they were entitled to costs and disbursements under section 15-37-10. Therefore, the Duttons failed to preserve this ground for review. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [circuit court] to be preserved for appellate review.").

The other three grounds for the Duttons' request for attorney's fees and costs were set forth in their post-trial motion for attorney's fees: (1) section 15-36-10, part of the Frivolous Civil Proceedings Sanctions Act (FCPSA),[11] which provides in part that a party "shall" be sanctioned for a frivolous claim or defense if the court finds the party failed to comply with one of three listed conditions and sanctions may include the prevailing party's reasonable attorney's fees and costs; (2) Rule 37(c), SCRCP, which allows a party to apply for the reasonable expenses, including attorney's fees, in proving a matter when the opposing party fails to admit the truth of the matter as requested under Rule 36, SCRCP; and (3) section 15-53-100 of the South Carolina Code (2005), part of the Uniform Declaratory Judgments Act (UDJA),[12] which states, "In any proceeding under [the UDJA,] the court may make such award of costs as may seem equitable and just."

The Duttons initially requested attorney's fees and costs in their Answer and Counterclaim and again during Lisa's testimony. While they did not specifically cite the above three grounds until they filed their post-trial motion, this motion sufficiently preserved these grounds for review. *See* Rule 54(d), SCRCP ("A motion for costs, supported by an affidavit that the costs are correct and were necessarily incurred in the action, may be filed by the prevailing party within 10 days of the receipt of written notice of the entry of final judgment."); *Rutland v. Holler, Dennis, Corbett, Ormond & Garner (Law Firm)*, 371 S.C. 91, 96, 637 S.E.2d 316, 319 (Ct. App. 2006) ("[B]ecause [the circuit court] retains jurisdiction pursuant to Rule 59(e), SCRCP, to alter or amend a

---

11. S.C. Code Ann. §§ 15-36-10, -100 (Supp. 2016).

12. S.C. Code Ann. §§ 15-53-10 to -140 (2005).

judgment within ten days of its issuance, a motion for sanctions [under the FCPSA] would be timely if filed within ten days of judgment." (first alteration in original) (quoting *Pitman v. Republic Leasing Co.*, 351 S.C. 429, 431, 570 S.E.2d 187, 189 (Ct. App. 2002))); *Sessions v. Withers*, 327 S.C. 409, 415, 488 S.E.2d 888, 891 (Ct. App. 1997) ("[E]xpenses should be imposed under Rule 37(c) 'only after the requesting party actually proves the . . . truth of the matter that was addressed in the request for admission.'" (emphasis omitted) (quoting 7 *Moore's Federal Practice* § 37.72 at 37-131 (3d ed.))).

▪▪ As to the merits, the circuit court's summary order denying all post-trial motions did not specifically address the above three grounds or the standards set forth in the corresponding statute or rule. We acknowledge that findings of fact and conclusions of law are generally not required for decisions on motions. *See* Rule 52(a), SCRCP ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 *or any other motion* except as provided in Rule 41(b)." [13] (emphasis added)); *Woodson v. DLI Props., LLC*, 406 S.C. 517, 527, 753 S.E.2d 428, 433 (2014) (citing Rule 52, SCRCP, for the proposition that findings of facts and conclusions of law on motions are not required for appellate review). However, the circuit court's order indicates it did not exercise any discretion to evaluate the Duttons' request for fees and costs under Rule 37(c), SCRCP or the UDJA. *See Samples v. Mitchell*, 329 S.C. 105, 112, 495 S.E.2d 213, 216 (Ct. App. 1997) ("A failure to exercise discretion amounts to an abuse of that discretion."); *see also Fontaine v. Peitz*, 291 S.C. 536, 538, 354 S.E.2d 565, 566 (1987) ("When the [circuit court] is vested with discretion, but [its] ruling reveals no discretion was, in fact, exercised, an error of law has occurred."); *Johnson v. Johnson*, 296 S.C. 289, 304, 372 S.E.2d 107, 115 (Ct. App. 1988) ("A decision lacking a discernible reason is arbitrary and constitutes an abuse of discretion."). In fact, Rule 37(c) requires the circuit court to exercise its discretion in a specific manner:

> If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if

---

13. Rule 41(b), SCRCP, concerns the involuntary dismissal of an action or cause of action.

the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court *shall* make the order *unless it finds* that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit.

(emphases added).

Further, the FCPSA, specifically section 15-36-10(C)(1), makes mandatory the circuit court's determination of whether a claim or defense was frivolous:

At the conclusion of a trial and after a verdict for or a verdict against damages has been rendered or a case has been dismissed by a directed verdict, summary judgment, or judgment notwithstanding the verdict, upon motion of the prevailing party, the court *shall* proceed to determine if the claim or defense was frivolous.

(emphasis added). Section 15-36-10(C)(1) also sets forth specific standards for determining frivolity:

An attorney, *party*, or pro se litigant shall be sanctioned for a frivolous claim or defense if the court finds the attorney, *party*, or pro se litigant failed to comply with one of the following conditions: (a) a reasonable attorney in the same circumstances would believe that under the facts, his claim or defense was clearly not warranted under existing law and that a good faith or reasonable argument did not exist for the extension, modification, or reversal of existing law; (b) a reasonable attorney in the same circumstances would believe that his procurement, initiation, continuation, or defense of the civil suit was intended merely to harass or injure the other party; or (c) a reasonable attorney in the same circumstances would believe that the case or defense was frivolous as not reasonably founded in fact or was interposed merely for delay, or was merely brought for a purpose other than securing proper discovery, joinder of

proposed parties, or adjudication of the claim or defense upon which the proceedings are based.

(emphases added). Nothing in the order denying the parties' post-trial motions indicates the circuit court made such a determination.

Based on the foregoing, we remand to the circuit court for consideration of the above three grounds for attorney's fees and costs and for the required analyses of the underlying specific facts.

## CONCLUSION

Accordingly, we affirm the circuit court on the merits of Mother's and Sister's appeal, vacate the denial of attorney's fees and costs, and remand to the circuit court for an order consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND RE-MANDED.**

SHORT and MCDONALD, JJ., concur.